UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IBALDO ARENCIBIA,

     Plaintiff,

vs.

AGA SERVICE COMPANY d/b/a
ALLIANZ GLOBAL ASSISTANCE, a
Foreign For-Profit Corporation;
AMERICAN AIRLINES, INC., a Foreign
For-Profit Corporation; and
JEFFERSON INSURANCE COMPANY, a
Foreign For-Profit Corporation,

     Defendants.

_____/

**CASE NO.**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff, Ibaldo Arencibia ("Arencibia"), individually and on behalf of all others similarly situated, through his counsel, sue Defendants, AGA Service Company d/b/a Allianz Global Assistance ("Allianz"), American Airlines, Inc. ("AA"), and Jefferson Insurance Company ("Jefferson"), for damages and equitable relief. In support of his claims, Arencibia alleges the following:

## INTRODUCTION

Traveling is often a pleasurable experience, even when it is done for work. The change in scenery from the regular routine of the workplace can add a little motivation to the sometimes-monotonous, long workdays. The logistics of travelling are, however, never simple. Early arrivals at airports, check-ins, luggage-size issues, luggage-misplacement problems, long security lines, delays, and the anathema of all travel: trip cancellations. This is what this case is about. A company

promising protection from the very thing travelers dread the most—cancellations—and coming far short of its promise, even misrepresenting the contents of the product it offered and continues to offer to unsuspecting consumers. In the process, this company and its partners enrich themselves at the expense of innocent consumers.

## THE PARTIES

1.  Plaintiff Arencibia is an individual who resides in Miami-Dade County, Florida.

2.  Defendant Allianz is a foreign for-profit corporation and was, at all relevant times, doing business in the State of Florida. Allianz is the main seller of the "travel insurance" policy at issue in this case.

3.  Defendant AA is a corporation that is incorporated in Delaware, has its principal place of business in Texas, and was, at all relevant times, doing business in the State of Florida.

4.  Defendant Jefferson is a foreign for-profit corporation and was, at all relevant times, doing business in the State of Florida. Jefferson acts as the underwriter for the "travel insurance" policy that Allianz sells.

## JURISDICTION AND VENUE

5.  This is a class action lawsuit for damages within the jurisdiction of this Court.

6.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A) because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which at least one member of the class of plaintiffs is a citizen of a State different from at least one defendant.

7.  This Court has personal jurisdiction over Allianz because it continuously and systematically does business in Florida and avails itself of Florida's market. This Court also has personal jurisdiction pursuant to §48.193, Fla. Stat., Florida's long-arm statute.

8.      This Court has personal jurisdiction over AA because it continuously and systematically does business in Florida and avails itself of Florida's market. This Court also has personal jurisdiction pursuant to §48.193, Fla. Stat., Florida's long-arm statute.

9.      This Court has personal jurisdiction over Jefferson because it continuously and systematically does business in Florida and avails itself of Florida's market. This Court also has personal jurisdiction pursuant to §48.193, Fla. Stat., Florida's long-arm statute.

10.     Venue is proper in this district under 28 U.S.C. §1391(b)(2), in that a substantial part of the events, acts, and/or omissions giving rise to the claims occurred in this district. Moreover, Defendants' wrongful acts in this district have impacted the general public of this district, and the ends of justice require that parties residing in other districts be brought before this Court.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

*The Named Plaintiff*

11.     Arencibia is a 32-year-old man who immigrated from Cuba when he was 15.

12.     Since he immigrated from Cuba, Arencibia has worked many blue-collar jobs until a job as an electrical lighting technician ("Lighting Tech") assistant caught his interest.[1] Little by little, he started getting more work for several event-producing companies where he learned and perfected the skills of a Lighting Tech.[2]

13.     After a few years working for several small companies, Arencibia obtained a job at Univision where he worked as a full-time Lighting Tech for nearly 6 years.

---

[1] For more information, *see Lighting technician*, Wikipedia, https://en.wikipedia.org/wiki/Lighting_technician (last visited Oct. 17, 19).
[2] Though not his specialty, Arencibia has knowledge of video and audio as well.

14.     After 6 years at Univision, Arencibia realized he had reached his professional ceiling at the company and decided to venture as a freelance Lighting Tech.

***The Expo and the "Insurance" Option***

15.     Though he never completed formal higher education, Arencibia is intellectually curious. Having found a field that he enjoys, he is driven to make it in the Lighting Tech industry.

16.     In his efforts to be a better Lighting Tech, Arencibia registers for seminars, congresses, expos, and conferences related to his field. Thus, early in August 2019, Arencibia learned of an interesting expo and seminar in Bogota, Colombia from October 23-25.[3]

17.     Arencibia, who supports his girlfriend (a full-time pre-vet student), was unsure if he was going to have any gigs at the time of the Bogota expo. As the sole income earner of his household, Arencibia lives, for the most part, paycheck to paycheck. Thus, he did not want to miss out on any potential opportunity to make much needed income should an important, lucrative job come up.

18.     On August 17, 2019, Arencibia proceeded to purchase his ticket to Bogota. He purchased a flight leaving Miami on October 22, 2019 at 5:40 PM and returning on October 27, 2019 at 6:10 AM from Bogota.[4] Through the online process, Arencibia was presented with a "travel insurance" option while he was purchasing his ticket to Bogota. Arencibia looked at it, and because it seemed like a good option to protect his trip, he decided to buy it.

19.     When he first saw the insurance option, Arencibia was led to believe that it was simple "insurance," in the plain meaning of that word. In essence, he thought: "If I don't travel, I am insured." After reading in more detail the offer of insurance, his belief was reaffirmed. In fact,

---

[3] For more information on the Bogota expo, *see* InfoComm Colombia, https://colombia.infocomm.show/ (last visited Oct. 17, 19).
[4] Record Locator: GBLGFP.

to him, Allianz's disclosure made it clear that if he did not choose the "insurance option," he would be personally responsible for all cancellation fees and expenses—as Allianz's offer explicitly states.[5] In other words, Arencibia thought, logically, that if he chose the insurance option, he would not be responsible for any cancellation fees and would be reimbursed the price of his flight—i.e., that he would be insured. The insurance, he thought, solved his work-travel dilemma, namely, he would not have to choose between losing the price of the flight to Colombia and the much-needed work income should a job come up. At most, he would be responsible for the $36.83 he would pay to Allianz for the policy and its coverage.

20.     As it turned out, Arencibia was offered to go on a 7-day tour as a technician to different states in the U.S. (including Louisiana, Georgia, and Pennsylvania), on days that overlapped the already purchased Bogota trip. The job would earn Arencibia approximately $3,500, a large sum of money for his household.

21.     Thinking he was "insured," Arencibia, on or about September 1, 2019, contacted Allianz via telephone. During the call, Arencibia was told by an Allianz agent that his work conflict was not covered by his policy. Arencibia was also told by the Allianz agent that he should call AA to cancel the trip and then submit a claim online to "see what could be done."

---

[5] On information and belief, Arencibia saw and offer of insurance that is substantially similar or equal to the images below:



22.     On September 2, 2019, as instructed by the Allianz agent, Arencibia cancelled the flight with AA and completed the online claim submission. He then received an email saying that he needed to wait 10 business days for Allianz to review the claim. See Email, **Exhibit A**.

23.     On September 9, 2019, Arencibia received a Letter from Allianz stating:

We have completed our review of your claim, and unfortunately are unable to provide benefits under the coverage you purchased because:

As your insuring agreement indicated, this is a named perils travel insurance program, which means it covers only the specific situations, events and losses included in this document, and only under the conditions we describe. Unfortunately, trip cancellation due to being required to work is not included among those reasons.

See Allianz Letter Denying Claim, **Exhibit B**.

24.     The letter from Allianz to Arencibia denying the claim was in stark contrast with Allianz's representations before he bought the "insurance," which included broad language encouraging its purchase and alluding to its protections, including, without limitation, "Yes, protect my trip" and "Includes trip cancellation, trip interruption, . . . and more." See footnote 5, above.

25.     Moreover, Allianz's offer of insurance is made even more misleading when consumers elect to decline the offer and click the "No" button. Allianz's disclosure then reads as follows:

No, I choose not to protect my [price of flight] purchase. I understand by declining coverage I am responsible for all cancellation fees and expenses.[6]

26.     Like Arencibia, a reasonable consumer would get the net impression that Allianz's insurance provides broad, no-fault insurance protection and coverage, and that should one choose to purchase this insurance, one would not be "responsible for all cancellation fees and expenses."

---

[6] On information and belief, Allianz's disclosure next to the "No" button is identical or substantially similar for all consumers.

27.     Like Arencibia, a reasonable person would not understand that, when purchasing a product for $36.83 to insure a flight worth $491.03, one would have to hire an attorney to read and interpret sophisticated contractual documents which actually contradict or are different from the very essence of the sweeping offer of insurance "protection."

28.     Like Arencibia, a reasonable person, faced with Allianz's offer of insurance protection and coverage, would not think that the insurance he was purchasing was, in essence, extremely limited, applicable only to specific and unlikely named perils, such as medical emergencies, illness, or catastrophic events.

29.     Like Arencibia, a reasonable person, if told that the insurance covers mainly medical emergencies or catastrophic events, would not purchase travel insurance in the context of already expensive flight tickets. In fact, for the average person, traveling is an expensive proposition (even in economy class), and most consumers do not want to add even one single dollar to the price of the flight, if they can avoid it.

30.     Allianz knows that a reasonable consumer is aware that catastrophic events or medical emergencies are rare and that if it were to truthfully disclose the essence and nature of what its product covers, most travelers would not purchase its "insurance."

31.     AA also knows this but driven by profitable kickbacks it receives from Allianz for letting it sell "insurance" on AA's website, AA is complicit in Allianz's scheme to mislead unsuspecting customers into purchasing this essentially empty "insurance" coverage.

32.     Like Arencibia, a reasonable person would expect, after seeing the insurance option and the option to refuse insurance, that by choosing to "protect" his trip, the trip would be protected as long as it was not cancelled because of a simple change of heart about traveling but there was some reason not to travel.

33. Like Arencibia, a reasonable person would understand "trip cancellation" to mean that, if one cannot travel, one is protected when the trip is "cancelled."

34. Like Arencibia, a reasonable person would understand "trip cancellation" to mean a cancellation of the trip other than an airline cancellation, since most consumers know that if the airline cancels a particular flight, the airline itself will arrange a new flight or reimburse it.[7] In other words, "trip cancellation" cannot reasonably mean the cancellation of the trip by the airline. Since only two parties have the power to "cancel" the trip, the airline or the consumer, by not traveling, a reasonable consumer would understand that "insurance" for "trip cancellation" means cancellation by the consumer.

35. The resulting net impression created in Arencibia and other similarly situated putative Class Members, based on Allianz's offer and representations, is that they were receiving a broad-range, no-fault travel protection insurance package.

36. Like Arencibia, a reasonable consumer would interpret "cancellation" (without modifiers, as in Allianz's offer) to mean "the act or an instance of canceling" a flight.[8]

37. Arencibia was not refunded by AA the money he paid for the Bogota trip and, in fact, was responsible for paying 100% of the fees and expenses (in addition to paying Allianz the $36.83), in contradiction to the plain language of the offer of insurance.

38. It would be easy for Allianz to correct its offer of insurance in a way that accurately reflects the nature, essence, and substance of what it covers, which is narrow and largely related to medical emergencies, illness, or catastrophic event emergencies.

---

[7] Even in weather-related cancellations, the cancellation occurs due to the airline cancelling the flight, not the weather itself. The airline determines that the weather is not safe, and thus, cancels.
[8] *Cancellation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cancellation (last visited Oct. 17, 19).

39.     For example, in its "Individual Travel Insurance Policy," Allianz describes the "covered reasons" for cancellation under the policy. Items 1 through 7 are related to illness, injury, a medical condition, or death. Items 9 through 16 relate to catastrophic events in connection with weather, terrorism, and other similar events. See Individual Travel Insurance Policy, pp. 7-9, **Exhibit C**.

40.     It would be easy for Allianz, a Fortune 500 corporation, to fix its offer to say: "this is a medical emergency, illness, or catastrophic event insurance," and thus truthfully reveal to consumers the essence, nature, and substance of what it is selling to them.

41.     It would be easy for Allianz, a Fortunate 500 corporation, to fix its disclosure and disclose, for example, what it wrote in its letter denying insurance to Arencibia: "this is a named perils travel insurance program, which means it covers only the specific situations, events and losses included in this document." **Ex. B**.

42.     Alternatively, Allianz could disclose what it writes on its "About this Policy" document: "Not every loss is covered, even if it is due to something sudden, unexpected, or out of *your* control. Only those losses meeting the conditions described in this *policy* may be covered." **Ex C**, p.1 (emphasis in original).

43.     Allianz's post-purchase emails are equally misleading. For example, Allianz emails its customers saying, "Thanks for protecting your upcoming travel plans with us." See Email, **Exhibit D**. The entire "thank you" email lacks any disclosure as to the substance, essence, and nature of Allianz's coverage, namely, medical emergencies and catastrophic events.

44.     To make matters worse, Allianz's "insurance policy" is provided to consumers only after payment is made (simultaneously with the flight ticket payment), through a separate link that

then leads the purchaser to a 36-page sophisticated legal document that is, in nature and substance, different from the offer conveyed to consumers pre-payment. See, generally, **Ex. C**.

45.     As seen above, Allianz and Arencibia (and the Class Members) had different things in mind when they entered into a business relationship. On the one hand, Allianz knew that it was selling a product that overwhelmingly covers only medical or catastrophic event protection, (things that rarely occur), while on the other hand, based on Allianz's representations, Arencibia's impression was that he was purchasing a broad, no-fault insurance.

46.     On information and belief, Allianz's offer of insurance is fairly uniform. Each consumer sees the same or substantially the same offer language when purchasing insurance in the AA website system.

*AA's Assistance in the Unlawful Enrichment Scheme*

47.     AA plays a vital role in Allianz's empty offer of insurance scheme.

48.     First, AA provides access to its massive online platform of flight purchases to Allianz, who can then make a convenient, strategically located offer (on the flight payment screen) that misleads consumers.

49.     Second, although AA makes a casual, discrete disclosure that this offer of "insurance" is purchased from a third-party and not from AA itself, it provides the weight of its name to the "Allianz Insurance" and thus, most consumers are under the impression that they are buying an AA product or at least, an AA-sponsored product.

50.     Third, AA requires consumers to make a selection regarding this "trip insurance," and there is no way to purchase a flight without making this selection, one way or the other. This forced selection, accompanied by statements like: "[large number] American Airlines customers protected their trip in the last 7 days"; "Recommended"; "Purchase travel insurance. – The Boston

Globe" and the radical prospect of the alternative—"I understand by declining coverage I am responsible for all cancellation fees and expenses"—makes it the perfect pitch for massive purchases of what is in reality a low-claim, rarely-paid policy by Allianz and a no-risk-no-cost profit machine to AA and Jefferson.

51.     Fourth, AA sells both "refundable" and "non-refundable" flights. Refundable flights are, generally speaking, prohibitively expensive tickets, prompting those needing to buy a flight for a future trip to resort to "non-refundable" tickets. For these consumers, the "insurance" is their only option to protect purchased flights when they are uncertain about travel but, at the same time, cannot afford the usually high prices that AA charges for a "refundable" ticket. For example, a coach non-refundable ticket in AA can cost $378, while a coach refundable ticket can be four times as much or $1,372.[9]

52.     Fifth, AA's change policy is so burdensome, sophisticated, and expensive that it sets the stage for consumers to purchase "trip insurance." For example, AA charges a $275 fee for an international "change of flight" plus the difference between the flight at the time of purchase and the flight at the time of change. In addition to the fees (which could match or exceed simply buying a new flight), the actual process of calling AA's customer service and staying on the phone for long periods of time acts as a natural deterrent to consumers who either give up on the flight and buy a new one or opt for the "travel insurance" option.

53.     The convenience of its powerful platform, the carefully-crafted placement of the offer, the prohibitively-expensive nature of "refundable" tickets, and the complex and burdensome process of obtaining a refund or "credit" for flights consumers cannot make, contributes and prompts consumers to buy "travel insurance protection" which is, at the same time, carefully

---

[9] William Morse, *The Pros and Cons of Fully Refundable Airfare*, The Points Guy (Aug. 4, 2015), https://thepointsguy.com/2015/08/fully-refundable-airfare/.

crafted to portray a broad range of non-existent protections, at a convenient price, where consumers are buying an empty policy that they did not mean to buy, while AA and Allianz enrich themselves.

54.    AA has knowledge of this scheme because, on information and belief, it has a contract with Allianz for the payment of an undisclosed portion of the "travel insurance" fee.

55.    AA gives the impression that the "trip insurance" is in the consumers' best interest when in reality, it knows the insurance coverage is devoid of meaningful protections and is a massive profiteering machine for AA.

56.    Consumers get the net impression that AA is either the seller of the insurance or a close partner of Allianz in the sale of the travel insurance protection.

57.    On information and belief, AA does not hold a license to sell insurance, and is generally prohibited from selling insurance to consumers (and thus, cannot receive commissions on its sales) because it is not licensed as an insurer or insurance agent in the State of Florida or any other state.

***Jefferson's Assistance in the Unlawful Enrichment Scheme***

58.    Jefferson acts as the "underwriter" of the Allianz branded travel plans.

59.    To "underwrite" is "to set one's name to (an insurance policy) for the purpose of thereby becoming answerable for a designated loss or damage on consideration of receiving a premium percent."[10]

60.    "In the insurance industry, the practice of underwriting refers to the process of accepting or rejecting risks. [. . .] An underwriter is the person who decides whether or not to insure risks for which applications have been submitted. The underwriter's task is to evaluate a risk,

---

[10] *Underwrite*, Merriam-Webster, https://www.merriam-webster.com/dictionary/underwrite (last visited Oct. 17, 19).

estimate the potential exposure, determine the likelihood of loss, then make a decision whether or not to accept the application for insurance."[11]

61.    On information and belief, Jefferson does not have any genuine process for "accepting or rejecting" the trip protection risks. Instead, policies are issued and accepted automatically regardless of the customers' particular conditions or the specific destination risks.

62.    Because policies are issued automatically after payment is made, it is impossible for Jefferson to "evaluate [the] risk, estimate the potential exposure, determine the likelihood of loss, [and] then make a decision whether or not to accept the application for insurance."

63.    In other words, even though it does no "underwriting" as that term is generally understood in the insurance context, Jefferson receives a hefty kickback from Allianz for the low-claim, rarely paid policy.

64.    Further, Jefferson, as the signer of the policy, is well aware of its contents and knows that, in essence and substance, the travel insurance policy is narrowly limited to medical emergencies or catastrophic events, in contradiction to the offer of insurance its partners, Allianz and AA, make to consumers at the time of purchase.

65.    Although it is aware of the policy and its limitations, Jefferson decides to participate in this scheme because it profits millions of dollars from it.

## CLASS ACTION ALLEGATIONS

66.    Federal Rule of Civil Procedure 23 authorizes that a case be brought as a class action. Plaintiff here seeks certification of the following class:

All persons who purchased a trip insurance policy from Allianz through AA's website[12] within the applicable limitations period (the "Class Period").

---

[11] *Underwriting (Insurance)*, Encyclopedia of Business, https://www.referenceforbusiness.com/encyclopedia/Thir-Val/Underwriting-Insurance.html (last visited Oct. 17, 19).

[12] https://www.aa.com.

67. Excluded from this class are Allianz, AA, and Jefferson, and their respective affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

***Numerosity***

68. This class action satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1). The Class defined in this Complaint is sufficiently numerous that separate joinder of each member is impracticable as the Class will include hundreds of thousands of members.

***Commonality***

69. This class action satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2), as the claims raise questions of law and fact common to each member of the Class, which include, without limitation:

(a) Whether Allianz intentionally or negligently misrepresents the nature and substance of its "Travel Insurance" or "Trip Cancellation" policy at the time it offers it to consumers, in order to induce them to buy an extremely narrow policy that, had Allianz truthfully disclosed, they would not otherwise buy;

(b) Whether AA's actions set the stage for Allianz's unlawful practices (and colludes with Allianz) by: (1) conveniently placing, knowing it is misleading, an offer of insurance in the payment section of its website; (2) making refundable tickets prohibitively expensive; (3) having a burdensome cancellation and change of flights process; and (4) confusing consumers as to who is the true sponsor of the travel protection insurance; in a way that leaves consumers who are uncertain about travel dates at the time of purchase with the empty "travel insurance" as the only available travel protection alternative; and

(c) Whether AA should be permitted to let Allianz use its platform to defraud consumers and enrich itself, even if AA is not directly the provider of the "insurance protection" product.

***Typicality***

70. This class action satisfies the typicality requirement of Fed. R. Civ. P. 23(a)(3) as the claims made by the named Plaintiff are similar to those of the other members of the Class. For

example, most putative Class Members are exposed, through AA's website, to an equally misleading offer of insurance for which they are not reimbursed when trips are cancelled.

*Adequacy*

71.    This class action satisfies the adequacy requirement of Fed. R. Civ. P. 23(a)(4) because Arencibia will fairly and adequately protect and represent the interests of each member of the Class, since he has suffered the same wrongs as the other putative Class Members.

72.    Arencibia is well aware of his responsibilities as a Class Representative and has retained Ayala Law, P.A. and Fulgencio Law, P.L.L.C. to pursue this matter. Ayala Law, P.A. and Fulgencio Law, P.L.L.C. are experienced in complex litigation and have the necessary resources to meet the costs and requirements of a case of this type.

*Superiority*

73.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for a variety of reasons, including, without limitation, that it would be an inefficient use of judicial resources to require each putative Class Member affected by Defendants' actions to bring its own claim. Moreover, the case deals with common issues of law that may be adjudicated uniformly in one single action without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require.

*Fed. R. Civ. P. 23 Requirements*

74.    The prerequisites for maintaining a class action under Fed. R. Civ. P. 23(b)(2) exist because Defendants have acted or refused to act on grounds that apply to the entire class, making injunctive and equitable relief appropriate.

75.    Specifically, Plaintiff seeks an order declaring that Allianz's offers of trip insurance (and AA and Jefferson's role in the scheme) are deceptive and misleading and violate applicable

federal and state laws. Plaintiff requests an injunction against Defendants preventing them from making further misleading offers to Class Members.

76.     The prerequisites for maintaining a class action under Fed. R. Civ. P. 23(b)(3) also exist because there are questions of law or fact common to all Class Members that predominate over any questions affecting only individual members. Questions include, without limitation: (1) whether Allianz's offer of insurance to consumers was deceptive and misleading; (2) AA's role in the insurance enrichment scheme; and (3) Jefferson's role in the insurance enrichment scheme.

<u>COUNT I – DECLARATORY ACTION</u>
*(As to all Defendants)*

77.     Plaintiff incorporates paragraphs 1 through 76 fully in this Count.

78.     Plaintiff currently has an actual and justiciable controversy between him, as representative of a class of plaintiffs, and Defendants.

79.     More specifically, Plaintiff has a question as to what his rights are under the "contract of insurance" with Allianz and Jefferson. Plaintiff does not know whether his contract is legitimate and enforceable given that Allianz grossly misrepresented the contents of the insurance contract at the time of the offer in an effort to induce thousands of consumers that, had they known the truth, would have not purchased it.

80.     Plaintiff alleges that Allianz concealed material facts that were easily disclosable but that it chose not to disclose in an effort to induce the purchase of a policy it knows consumers would not otherwise buy, and which is strictly limited to medical emergencies or catastrophic events.

81.     Plaintiff does not know whether Allianz's misleading offer of insurance renders the insurance policy contract completely null and void.

82.     Plaintiff does not know whether Allianz offered adequate consideration for the payment of the policy.

83.     Plaintiff does not know either to what extent AA and Jefferson should also be held responsible in this insurance scheme given that the former sets the stage, by giving its name and platform to a product it knows or should have known is devoid of content, while the latter acts as an "underwriter" of an empty policy that does not require any underwriting work.

84.     Plaintiff's doubts are bona fide and are primarily born out of the losses and waste of money incurred as a result of what he believes is Defendants' conduct or neglect of their responsibility to truthfully disclose the contents of the insurance protection product.

85.     Defendants will contend that they are not misrepresenting anything and that they fully disclosed the contents of their insurance protection product. Defendants will also contend that their narrow medical emergency and catastrophic event coverage is adequate consideration for what consumers pay.

86.     Because of the diametrically opposed views of the parties, there is an actual, present need for this Court's declaration.

87.     The unsettled state of affairs between Plaintiff and Allianz, AA, and Jefferson, is creating a financial burden on putative Class Members who purchased (and will continue to purchase) a travel insurance protection that they did not intend to buy and that does not protect them.

WHEREFORE, based on the allegations on this Count I, Plaintiff demands a judgment against Defendants declaring:

(a)     That Defendants wrongfully induced Plaintiff to purchase travel insurance protection by misrepresenting the substance, essence and nature of what their product was;

(b)      That the insurance contract is void; and

(c)      Any such other and further relief as this Court may deem just and proper.

**COUNT II – UNJUST ENRICHMENT**
*(As to all Defendants)*

88.      Plaintiff incorporates the allegations in paragraphs 1 through 76 fully in this Count.

89.      Plaintiff conferred a benefit on Defendants in the form of payment of a premium that they then split between themselves in different percentages.

90.      Allianz knowingly and voluntarily accepted these benefits by collecting the payment for premiums every time a Class Member purchased travel protection insurance.

91.      AA knowingly and voluntarily accepted these benefits by receiving a kickback from the unlawful premium collected by Allianz, for little or no work performed.

92.      Jefferson also knowingly and voluntarily accepted these benefits by receiving a kickback from the unlawful premium collected by Allianz, for little or no work performed.

93.      As a result, Defendants benefited by being unjustly enriched from the payments they received from thousands or millions of consumers, while rarely having to pay out the wrongfully disclosed product.

WHEREFORE, Plaintiff requests an order declaring that Defendants unjustly enriched, for monetary damages, prejudgment interest, attorney's fees and costs, and any other relief that the Court deems just and equitable.

**COUNT III – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (§501.201, Fla. Stat. et seq.)**
*(As to all Defendants)*

94.      Plaintiff incorporates the allegations in paragraphs 1 through 76 fully in this Count.

95.      This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

96.     FDUTPA renders unlawful any unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct "of any trade or commerce." Under FDUTPA, "trade or commerce" is defined to include advertisement or solicitation of any "thing of value." §501.203(8), Fla. Stat.

97.     Plaintiff is a "consumer" within the meaning of FDUTPA.

98.     Defendants' actions were unfair and deceptive in that they misrepresented the real contents of their travel insurance policy.

99.     When Defendants made statements like: "Yes, protect my trip" and "Includes trip cancellation, trip interruption, . . . and more," Defendants intended to portray to consumers the impression that they were selling a very broad, no-fault travel protection when in reality they were selling a limited, very narrow, medical illness and catastrophic event insurance. This practice was deceptive and unfair.

100.    When Defendants displayed to consumers the option:

"No, I choose not to protect my [price of flight] purchase. I understand by declining coverage I am responsible for all cancellation fees and expenses."

Defendants wanted consumers to get the net impression (as Arencibia did) that the insurance provided broad, no-fault insurance protection and that should one choose to purchase it, one would not be "responsible for all cancellation fees and expenses." This was deceptive and unfair.

101.    Defendants' acts are considered unlawful and unfair methods of advertisement, solicitation, competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined by §501.203, Fla. Stat.

102.    As a direct and proximate cause of Defendants' unlawful acts, Plaintiff has been damaged in that he has sustained losses that he would otherwise not have but for Defendants' actions.

WHEREFORE, Plaintiff, on behalf of himself and others similarly situated, requests an order for actual damages for Defendants' violation of FDUTPA, monetary damages and prejudgment interest, attorney's fees and costs pursuant to §§501.211(2), 2105, Fla. Stat., an injunction against Defendants, and any other relief that the Court deems just and equitable.

## COUNT IV – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §1961 et seq.)
### *(As to all Defendants)*

103.    Plaintiff incorporates the allegations in paragraphs 1 through 76 fully in this Count.

104.    This is an action for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

105.    Allianz, AA, and Jefferson participated in an enterprise in interstate and foreign commerce in which they sold hundreds of thousands of meaningless trip insurance policies that consumers never intended to purchase and that, had there been truthful disclosure of the real contents of the trip insurance policies, Class Members would have not purchased. Each member of the enterprise has an agreement with each other setting forth its role in the enterprise.

106.    The enterprise and its activities are ongoing, and its only goal is to enrich Defendants at the expense of innocent consumer Class Members.

107.    The enterprise intentionally hid, not only the inter-company kickback scheme, but the nature, content and substance of what it was selling.

108.    The enterprise operated as follows:

(1)    Allianz makes a sweeping, unqualified offer of travel protection to consumers in which it appears to sell a no-fault broad-coverage insurance, when in reality it is selling a very narrow, medical emergency and catastrophic event insurance that consumers will rarely use;

(2)    AA provides convenience of payment for the insurance policy at the time of the flight purchase;

(3)     Consumers fall for this misleading offer and make payment to AA by electronic means;

(4)     AA then uses mail and wire facilities, in violation of 18 U.S.C. §§1341 and 1343, to transfer the money to Allianz but keeps an undisclosed portion of the unlawfully obtained funds;

(5)     AA, knowing that the money it receives represents the proceeds of some form of unlawful activity, accepts it in violation of 18 U.S.C. §1956;

(6)     Allianz, knowing that the money it receives represents the proceeds of some form of unlawful activity, accepts it in violation of 18 U.S.C. §1956;

(7)     Allianz also uses mail and wire facilities, in violation of 18 U.S.C. §§1341 and 1343, to transfer a portion of the money received from AA for the travel insurance to Jefferson for "underwriting"; and

(8)     Jefferson, knowing that the money it receives represents the proceeds of some form of unlawful activity, accepts it in violation of 18 U.S.C. §1956.

109.    Further, Allianz, AA, and Jefferson also use mail and wire facilities in the enterprise, in violation of 18 U.S.C. §§1341 and 1343, to deceptively market the empty travel insurance policy.

110.    Allianz, AA, and Jefferson also use mail and wire facilities in the enterprise, in violation of 18 U.S.C. §§1341 and 1343, to send the fraudulent travel insurance policy documents.

111.    In the enterprise, AA uses its major corporate personality and its otherwise reputable and large online platform, to provide legitimacy to Allianz's empty offer of insurance. In fact, in many cases, consumers do not know that they are buying an "Allianz" product, but they get the impression that they are either buying an AA product, or an AA-sponsored product. AA does this even though it knows that Allianz's "insurance" is a very narrow product that its being portrayed misleadingly to consumers. AA does this because of the hefty kickbacks it keeps (or receives via wire) from Allianz, for little or no work done.

112.    In the enterprise, Jefferson acts as the "underwriter" in order to give the appearance of the policy being a "real insurance." Jefferson, though it has knowledge of the nature of the offer Allianz makes to consumers, and the nature and substance of the actual product sold (and the mismatch between the two), participates in the enterprise because it makes hefty commissions not from "underwriting" but for being essentially a customer service center in charge of denying the overwhelming majority of the claims on the policies.

113.    When the enterprise makes (or permits partners to make) statements like: "Yes, protect my trip" and "Includes trip cancellation, trip interruption, . . . and more," Defendants intend to portray to consumers the net impression that the product being sold is a broad, no-fault, travel protection when in reality the product is a much more limited,  narrow, medical illness and catastrophic event insurance only. This constitutes racketeering activity.

114.    When the enterprise displays to consumers the option:

"No, I choose not to protect my [price of flight] purchase. I understand by declining coverage I am responsible for all cancellation fees and expenses."

the enterprise wants consumers to get the impression (as Arencibia did) that the insurance provides broad, no-fault insurance protection and that should one choose to purchase it, one would not be "responsible for all cancellation fees and expenses." This also constituted racketeering activity.

115.    As a direct and proximate cause of Defendants' racketeering activity, Plaintiff has been damaged in that he has sustained losses that he would otherwise not have but for Defendants' actions.

WHEREFORE, Plaintiffs respectfully requests that this Honorable Court enter judgment in favor of Plaintiff against Defendants, in an amount equal to three times the damages suffered by Plaintiff, pursuant to 18 U.S.C. §1964(c); award Plaintiff his attorney's fees and costs pursuant to 18 U.S.C. §1964(c); and afford such other and further relief as may be just and proper.

## COUNT V – FALSE AND MISLEADING ADVERTISING
### *(As to all Defendants)*

116.    Plaintiff incorporates the allegations in paragraphs 1 through 76 fully in this Count.

117.    Allianz, together with AA and Jefferson, publicly disseminated advertising regarding its travel insurance policies that contained statements that were fraudulent, untrue and/or misleading.

118.    Defendants made statements like: "Yes, protect my trip" and "Includes trip cancellation, trip interruption, . . . and more," intending to portray to consumers the impression that they are selling a very broad, no-fault travel protection when in reality they are selling a limited, narrow, medical illness and catastrophic event insurance. Defendants made these statements to induce consumers to buy their travel insurance.

119.    When Defendants display to consumers the option:

"No, I choose not to protect my [price of flight] purchase. I understand by declining coverage I am responsible for all cancellation fees and expenses."

they want consumers to get the impression (as Arencibia did) that the insurance provides broad, no-fault insurance protection and that should one choose to purchase it, one would not be "responsible for all cancellation fees and expenses." Defendants made these statements to induce consumers to buy their travel insurance.

120.    Defendants knew, or in the exercise of reasonable care should have known, that these statements were untrue or misleading and that Class Members would be induced to rely on these claims in making their decisions.

121.    Defendants' statements constituted misleading advertising under §817.40(5), Fla. Stat.

122.    Defendants have derived substantial revenue from their false advertising. Plaintiff has been injured and deprived of property to which he is entitled and/or in which he has a vested interest by means of Defendants' violations of Florida's laws as to misleading advertising as alleged herein.

123.    Plaintiff is entitled to an order requiring Defendants to restore to Plaintiff all the money which Defendants may have acquired by means of such false advertising, including attorneys' fees, costs, and punitive damages pursuant to §817.41(6), Fla. Stat.

WHEREFORE, Plaintiff, on behalf of himself and others similarly situated, requests an order for actual and punitive damages for Defendants' violation of Florida's Misleading Advertising Law; attorney's fees and costs pursuant to §817.41(6), Fla. Stat.; and any other relief that the Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 17, 2019

Respectfully submitted,

Eduardo A. Maura, Esq.
Luis F. Quesada, Esq.
*Attorneys for Plaintiff*
**Ayala Law, P.A.**
1390 Brickell Avenue, 335
Miami, FL 33131
Telephone: 305-570-2208
Email: eayala@ayalalawpa.com

By: */s/ Eduardo A. Maura*
      Eduardo A. Maura
      Florida Bar No. 91303

Felipe Fulgencio, Esq.
*Attorney for Plaintiff*
**Fulgencio Law, P.L.L.C.**
105 S Edison Ave
Tampa, FL 33606
Telephone: 813-463-0123
Email: felipe@fulgenciolaw.com

By: */s/ Felipe Fulgencio*
      Felipe Fulgencio
      Florida Bar No. 95961